## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**EDMUNDO R. STIWARD**                                                    **CIVIL ACTION**

**VERSUS**                                                                        **NO. 05-1926**

**UNITED STATES OF AMERICA**                                    **SECTION: "K"(2)**


### ORDER AND REASONS

The above-captioned matter concerns a Jones Act case asserted against the United States

pursuant to the Suits in Admiralty Act ("SAA"), which generally permits civil claims to be filed

against the sovereign and tried without a jury where a private right of action would otherwise lie

in admiralty.[1]  This Court held a non-jury trial on liability and damages on April 8th-10th, 2008.[2]

---

[1]The relevant section, entitled "Waiver of Immunity," states:

**(a) In general.** - - In a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty in personam may be brought against the United States or a federally-owned corporation.  In a civil action in admiralty brought by the United States or a federally-owned corporation, an admiralty claim in personam may be filed or a setoff claimed against the United States or corporation.

**(b) Non-jury.** - - A claim against the United States or a federally-owned corporation under this section shall be tried without a jury.

46 U.S.C. § 30903.

[2]Plaintiff Stiward presented live testimony from the following witnesses: Edmundo Stiward (fact witness), Dr. Patrick Mottram (medical expert), Thomas Meunier, Jr. (vocational rehabilitation expert), Joseph G. Grace (expert in maritime practice), and Third Mate Eric Bailey (fact witness).  Plaintiff submitted deposition testimony of Chief Mate William Hugh Bagby (fact witness), Captain Richard Alcott (fact witness), and Captain Victor Goldberg (fact witness).

1

Plaintiff Edmundo Stiward ("Plaintiff" or "Stiward") brings this cause of action against the United States as owner of the M/V Cape Horn, a merchant vessel on which Plaintiff served. Plaintiff suffered a significant diabetic attack, diagnosed as diabetic ketoacidosis, while aboard the M/V Cape Horn. The M/V Cape Horn is a merchant marine vessel administered by the United States Maritime Administration ("MARAD") and operated on behalf of the United States by Marine Transport Lines ("MTL"), a non-governmental corporation. The Plaintiff claims that the failure of the vessel's officers to seek medical assistance, and the failure of the officers and the MTL to stock insulin caused him prolonged pain and suffering due to his diabetic attack, to include the amputation of his forefeet.[3] He asserts theories of Jones Act negligence and unseaworthiness.[4] Having heard the testimony of witnesses, having reviewed the relevant exhibits and depositions, and having examined the relevant law, this Court issues judgment in favor of the Plaintiff on both theories of liability for the reasons that follow. To the extent that any findings of fact are conclusions of law, they are adopted as such; to the extent that any conclusions of law are findings of fact, they are so adopted.

---

Defendant United States called as live witnesses Nancy Lattin (expert in health information management), Dr. Vivian Fonseca (medical expert), Third Mate Eric Bailey (fact witness), Petty Officer Steven Wood (fact witness), Master Sergeant Michael Malloy (fact witness), Captain Brian Hall (expert in maritime liability), and Carla D. Seyler (vocational rehabilitation expert). This opinion will cite the testimony or the deposition of each witness accordingly.

[3]Under the SAA, the sole remedy that is afforded to the Plaintiff is a suit against the United States because MTL operated the M/V Cape Horn as the agent of the United States. 46 U.S.C. § 30904. By order dated October 13, 2005, this Court dismissed MTL as a defendant. (Rec. Doc. 7).

[4]The Plaintiff did not assert a maintenance and cure claim as apparently the United States has fulfilled this obligation.

**I. FINDINGS OF FACT**

**A. Plaintiff's Background and Health History**

1.    Plaintiff Edmundo Stiward ("Plaintiff" or "Stiward") is presently a 65 year old man.

During the time relevant to the events herein, Stiward was 61 years old.  Stiward Test.

(4/8/08).

2.    Plaintiff's mother and brother had diabetes.  Stiward Test. (4/8/08).

3.    Plaintiff went to Louisiana Medical Center in January 2001 for treatment of a cellulitis

infection in his foot.  During that treatment, he was also told that his blood sugar was

high, and he was treated with insulin.  Stiward Test. (4/8/08).  The examining doctor

noted that Plaintiff had "possible new onset DM [diabetes mellitus]."  The doctor further

noted that the Plaintiff may need instruction, but did not need "Food/Drug Info"

regarding his condition.  Def. Ex. 4B.  The case manager noted that Plaintiff had "new

onset DM [diabetes mellitus]?"  Def. Ex. 4C.  These forms suggest only possible

diagnoses.  After discharge from the Louisiana Medical Center, he was prescribed pain

medication and antibiotics, but he was given no blood sugar management medication and

no dietary restriction.  Stiward Test. (4/8/08); Pl. Ex. 32.

4.    On January 30, 2001, Plaintiff was seen by a clinical social work case manager.  The

form memorializing the meeting notes that "Pt [Patient] is eager to learn all he can about

diabetes so that he can adequately care for himself."  Def. Ex. 4F.  The Government

cannot rely on this evaluation as evidence of the Plaintiff's knowledge of diabetes.  The

form merely expresses the Plaintiff's interest in learning about diabetes.  It does not show

that he knew that he had been permanently diagnosed with diabetes.

5.      In March 2001, Plaintiff was treated further at Louisiana Medical Center for cellulitis, including receiving a skin graft.  He was discharged as healthy and was not given any prescriptions or diet restrictions whatsoever. These physicians did not do any follow up regarding the Plaintiff's new onset diabetes to make a definite diagnosis or to determine the cause of his disease.  Stiward Test. (4/8/08); Ex. 32.

6.      Plaintiff had six standard physical examinations for fitness to serve on merchant vessels between 2000 to 2003.  At each examination, he had blood sugar level testing done. After each examination, the Plaintiff was found fit for duty.  At none of these examinations did any doctor tell Plaintiff that he had diabetes or blood sugar problems. Stiward Test. (4/8/08).  In fact, the blood sugar levels that were diagnosed do not necessarily signify diabetes.  Mottram Test. (4/8/08).

**B.  The M/V Cape Horn and the 2003 Voyage**

7.      The M/V Cape Horn was a merchant marine vessel owned by the United States and used in the service of the United States Maritime Administration ("MARAD").  The vessel was operated on behalf of the United States by Marine Transport Lines, Inc. ("MTL"). The M/V Cape Horn's crew was employed and paid by MTL, and the crew used MTL's procedures and polices in operating the M/V Cape Horn.  Bailey Test. (4/9/08).  The M/V Cape Horn was activated from reserve operating status in San Francisco, California, for the purpose of its 2003 voyage relevant herein.  Bailey Test. (4/9/08).

8.      Richard Alcott was the captain of the M/V Cape Horn during the relevant voyage.  Alcott was an experienced sailor in 2003, although the relevant voyage was Captain Alcott's

first tour as captain of a merchant marine vessel.  Alcott Depo. at 31.  Captain Alcott, as
captain of the M/V Cape Horn, had the general responsibility for the safety and welfare
of the crew.  Alcott Depo. at 80.

9.    Hugh Bagby was the Chief Mate of the M/V Cape Horn during the relevant voyage.  It
was his first voyage as chief mate.  Alcott Depo. at 101.  Bagby has served as an officer
aboard shipping vessels since 1989.  Bagby Depo. at 13-14.  Both Captain Alcott and
Chief Mate Bagby had previously served as medical officers aboard vessels prior to the
relevant voyage.  Bagby Depo. at 19; Alcott Depo. at 51.

10.   Third Mate Eric Bailey was designated as the ship's medical officer aboard the M/V
Cape Horn.  MTL's policy designated the third mate as the medical officer aboard all of
the vessels it operated.  Goldberg Depo. at 111.  Bailey's service aboard the Cape Horn
began in late January 2003.  It was his first tour of duty as a licensed deck officer.  He
was 24 years of age at the time.  Bailey Test. (4/9/08).  Bailey joined the M/V Cape Horn
in San Francisco shortly after the ship was activated from reserve operating status.
Bailey Test. (4/9/08).

11.   Third Mate Bailey received basic medical training while studying at the United States
Merchant Marine Academy.  He took a basic first aid and CPR course.  He had not
received any further medical training prior to taking on the role of medical officer for the
M/V Cape Horn.  Bailey Test. (4/9/08).  Third Mate Bailey understood that it was his job
as medical officer to report anything he did that was "medically related" to Captain
Alcott.  Bailey Test. (4/9/08).  Bailey's duty was to provide daily reports to Captain
Alcott concerning any and all medical illnesses.  Alcott Depo. at 76-77.

5

12.     Plaintiff signed on and served aboard the M/V Cape Horn as an able-bodied seaman from

        May 10, 2003 until July 8, 2003.  He joined the vessel while it was at drydock in Dubai,

        UAE.  Alcott Depo. at 87.

13.     When Plaintiff came aboard the M/V Cape Horn, he had not been prescribed and was not

        taking any medication for diabetes or blood pressure.  Alcott Depo. at 150.  He was only

        taking a prescription medication for prostate cancer.  Alcott Depo. at 155.

14.     Plaintiff's duty aboard the M/V Cape Horn included standing the "4 to 8 watch",

        meaning Plaintiff stood watch from 4:00 a.m. to 8:00 a.m., and also from 4:00 p.m. to

        8:00 p.m.  While at sea, an seaman stands watch on the bridge with the supervising watch

        officer.  Stiward Test. (4/8/08).  Chief Mate Bagby was the supervising watch officer of

        the 4 to 8 watch during all relevant time periods herein.  Alcott Depo. at 103.

15.     The M/V Cape Horn departed San Francisco, California on February 2, 2003.  Pl. Ex. 13.

        It entered port at Corpus Christi, Texas, on February 15, 2003, and departed on February

        18, 2003.  Pl. Ex. 13.  The M/V Cape Horn docked at port in Rota, Spain on March 2,

        2003, and departed that port on March 20, 2003.  Pl. Ex. 13.  Rota includes an American

        military base.  Bailey Test. (4/9/08).  The M/V Cape Horn anchored at the Kuwait naval

        base from April 15 to April 29, 2003.  Pl. Ex. 13; Bailey Test. (4/9/08).  The Kuwait

        naval base served as the port where all United States ready reserve fleet ships arrived.

        Bailey Test. (4/9/08).  The ship then entered drydocks at Dubai, United Arab Emirates

        (UAE), on May 4, 2003 and departed on May 24, 2003.  Pl. Ex. 13; Bailey Test. (4/9/08).

        The M/V Cape Horn visited Fujairah, UAE, on May 25, 2006, and departed the next day.

        It then returned to Fujairah on June 12, 2003.  Pl. Ex. 13.  The ship set sail from Fujairah

on June 13, 2003, and arrived in Port Hueneme, California, on July 11, 2003.  No ports were visited between Fujairah and California.  Pl. Ex. 13.[5]

16.    The M/V Cape Horn had constant access to email and telephone links to MTL's operational offices at all times relevant herein.  Bailey Test. (4/9/08).  The M/V Cape Horn also had access to Medical Advisory Service ("MAS") doctors at all times by satellite telephone.  Goldberg Depo. at 103.  The M/V Cape Horn had contact information for MAS for telephone, email, and fax.  Alcott Depo. at 159.  MAS is a service that provides ships at sea with 24-hour a day medical advice from doctors on shore, and MTL contracted with MAS to provide this service to its vessels at sea.  Alcott Depo. at 159; Goldberg Depo. at 103.  No person on board the M/V Cape Horn was a medical doctor, nor did any person have any high-level medical training.  The officers of the M/V Cape Horn knew that MAS doctors would have been better suited to make any medical diagnosis.  Alcott Depo. at 159-60.  MTL did not have any policy, guidelines or materials for crews that instructs them when it is appropriate to contact MAS doctors.  Goldberg Depo. at 104.

17.    Third Mate Bailey performed an inventory of medical supplies aboard the M/V Cape Horn monthly as part of his duties as medical officer.  Chief Mate Bagby instructed Third

---

[5]In the course of traveling from Fujairah, UAE to Port Hueneme, California, the M/V Cape Horn crossed the International Date Line on July 2, 2003.  The Court takes judicial notice of the fact that, by crossing the International Date Line eastward, the result is the "repetition" of a day.  Therefore, this Court will refer to these days as "first July 2nd" and the "second July 2nd" in order to avoid confusion.

All times and dates referred to herein will be local time to the M/V Cape Horn at its location at that time.  Occasionally, however, this opinion will make reference to times recorded as "Zulu Time" or "Greenwich Mean Time."  This refers to time at the Greenwich Mean.  Where such reference is made, it will be noted as "GMT."

Mate Bailey to perform a medical inventory of the M/V Cape Horn upon Bailey's arrival on board in California in January 2003.  Bailey Test. (4/9/08).  He completed an inventory of medical supplies on February 1, 2003, prior to the M/V Cape Horn's departure from California.  Pl. Ex. 47.  Third Bailey filled out the requisition order based on his inventory and delivered it to Chief Mate Bagby shortly after performing the inventory.  This order included insulin.  Bailey Test. (4/9/08).  The order also included a glucometer because it was "required" for "safety/as per MTL policy."  Ex. 51.

18.   The required content of the medical inventory list used by Third Mate Bailey was set forth by MTL, not MARAD or any other United States entity, and it included insulin. Alcott Depo. at 186-87.  The M/V Cape Horn's medical inventory form used in 2003 could not be located by the parties as it was missing or destroyed.  Alcott Depo. at 189. However, Third Mate Bailey admitted that Plaintiff's Exhibit 5, the medical requisition form for the M/V Cape Henry, was "very similar" to the medical requisition form that Bailey filled out while serving as the ship's medical officer aboard the M/V Cape Horn during the relevant period.  Pl. Ex. 5; Bailey Test. (4/9/08).  The M/V Cape Henry is a sister ship to the M/V Cape Horn.  Bailey Test. (4/9/08).  The medical requisition form includes under heading "Diabetes" the following items: "Insulin (Regular)", "Dextrose inj. 50%", and "Glucagon IM injection kit."  Pl. Ex. 5.   Also included on the requisition list are medical reference books, including *The Ship's Medicine Chest & Medical Aid at Sea*, a United States government publication.  Pl. Ex. 5.

19.   A crewmember would not be rejected from service aboard the M/V Cape Horn in 2003 solely because of his condition as a diabetic.  Goldberg Depo. at 48.

20.     Medical requisitions were emailed from the M/V Cape Horn to MTL's United States

        offices, which would obtain the materials and make them available to the M/V Cape

        Horn for pickup at port during its tour.  Bailey Test. (4/9/08).  If a vessel ordered medical

        items, "it was the responsibility of Marine Transport Lines to get those items to the

        vessel."  Goldberg Depo. at 87.  MTL could deliver medical supplies to any vessel it

        operated as long as the vessel was at port.  Grace Test. (4/9/08).  MTL had the capability

        of sending such supplies overnight to reach a vessel at port the next day.  Goldberg Depo.

        at 61.  MTL's policy was to fulfill any order for medical supplies made by vessels that it

        operated.  Any order would only be reviewed for accounting purposes, and then it would

        be filled.  No order for medical supplies would be rejected by MTL as unnecessary.

        Goldberg Depo. at 55.

21.     On March 28, 2003, a medical requisition order to MTL was made by Chief Mate Bagby.

        He did not include insulin in the March 2003 requisition.  Pl. Ex. 48.  No reason was

        provided for this exclusion.  A month later, on April 23, 2003, another order for medical

        supplies was issued by the M/V Cape Horn.  Included in this order was a request for

        "Insulin (Regular) 100 Units/ML, 10 M/L Vial."  Pl. Ex. 52A; Bailey Test. (4/9/08).  On

        May 5, 2003, a third order for medical supplies was issued by the M/V Cape Horn.

        Again, this requisition included an order for "Insulin (Regular) 100 Units/ML, 10 M/L

        Vial."  Pl. Ex. 52B; Bailey Test. (4/9/08).

22.     The M/V Cape Horn was at port at the Kuwait naval base from April 15 to April 29,

        2003.  Bailey Test. (4/9/03); Pl. Ex. 13.

23.     On May 25, 2003, a shipment of medical supplies was received by the M/V Cape Horn in

Fujairah, UAE.  Pl. Ex. 50; Bailey Test. (4/9/08).  Chief Mate Bagby sent a communication to MTL on May 28, 2003 informing MTL that half of the requested medical items, including insulin, were not part of the shipment received in Fujairah.  Pl. Ex. 53.  The M/V Cape Horn returned to Fujairah, UAE, on June 12, 2008.  Pl. Ex. 13. No further medical inventory was received aboard the M/V Cape Horn during its second visit to Fujairah.  No reason was given why the missing medical supplies were not provided to the M/V Cape Horn during its second visit to Fujairah.  Bailey Test. (4/9/08).

24.     From June 30 through July 8, 2003, the M/V Cape Horn was en route from the Middle East to Port Hueneme, California.  On June 30th at noon local time, the M/V Cape Horn was approximately 2400 nautical miles due west of Honolulu, Hawaii.  The M/V Cape Horn made a course crossing north of the Hawaiian Islands en route to California.  Def. Ex. 25B.

25.     On June 30, 2008, Stiward told Third Mate Bailey in Bailey's role as ship's medical officer that he had a small, white blister on his penis.  Ex. 17.  Bailey gave Stiward antibiotic ointment to apply to the blister.  Bailey Test. (4/9/08).  Stiward told Bailey again on July 1, July 2, and July 3 that he still had a blister on his penis.  Bailey never examined the blister, and he did not seek any advice from manuals or from onshore doctors.  Bailey only gave Plaintiff antibiotic ointment to apply to the blister.  Bailey Test. (4/9/08).

26.     On the second July 2, 2003, Plaintiff was standing watch on the bridge and told Captain Alcott that he was not feeling well.  He told Alcott that he was "getting weak," he was frequently thirsty, and he was urinating often.  Plaintiff told Alcott that he thought he

might have food poisoning.  Stiward Test. (4/8/08); Alcott Depo. at 89.  Captain Alcott specifically asked the steward and cook to determine if there was a "food supply issue" or any other health issue concerning the food being served aboard the ship.  He determined that "no one else had any complaint like [Plaintiff's] that I was aware of."  Alcott Depo. at 92.  At noon local time on the second July 2nd, the M/V Cape Horn was located approximately 1400 nautical miles west-northwest of Honolulu, Hawaii.  Def. Ex. 25B.

27.     On July 3, 2003, Plaintiff told Chief Mate Bagby during their 4:00 a.m. to 8:00 a.m. watch that he was feeling ill, including stomach discomfort, constant thirst and frequent urination.  Bagby Depo. at 55-57.  Bagby replied that the Plaintiff was "not looking too well."  Stiward Test. (4/8/08).  Chief Mate Bagby also observed during that watch that Plaintiff was "drinking a lot of water and urinating quite frequently."  Bagby Depo. at 59.  At this point, Plaintiff was turning down overtime hours offered to him by Chief Mate Bagby, which Bagby found to be unusual because most seamen seek overtime hours, and the Plaintiff had always accepted overtime hours.  Bagby Depo. at 55-57; Pl. Ex. 7.  Chief Bagby never told Third Mate Bailey about any of the Plaintiff's symptoms, including constant thirst, frequent urination, vomiting, or fatigue.  Bailey Test. (4/9/08).  Plaintiff testified that, after his watch, he went to see Third Mate Bailey and told him that he was frequently thirsty and was urinating frequently.  Plaintiff told Bailey that he thought he had food poisoning.  Stiward Test. (4/8/08).  Bailey diagnosed the Plaintiff with a "cold" or "the flu."  Pl. Ex. 18. At noon local time on July 3rd, the M/V Cape Horn was located approximately 1100 nautical miles northwest of Honolulu, Hawaii.

11

Def. Ex. 25B.

28.   On July 4, 2003, Plaintiff's condition worsened.  He was feeling very ill, his stomach was

      hurting him, he was still urinating frequently, and was "begging water", *i.e.*, asking

      anyone available for water because of his thirst.  Captain Alcott saw the Plaintiff on July

      4th at approximately 7:30 a.m. and told him that he was "not looking too good."  Stiward

      Test. (4/8/08).  Plaintiff told Chief Mate Bagby that he still felt ill on July 4th as well.

      Plaintiff turned down overtime work again on July 4th.  Stiward Test. (4/8/08); Bagby

      Depo. at 64.  Plaintiff was equivocal concerning when he told Third Mate Bailey about

      his condition.  However, it is clear from Plaintiff's testimony that Plaintiff told Bailey

      about his condition at least by July 4, 2003.  On July 4th at noon local time, the M/V

      Cape Horn was located approximately 950 nautical miles north-northwest of Honolulu,

      Hawaii, and approximately 2350 nautical miles west of Port Hueneme, California.  Def.

      Ex. 25B.

29.   Chief Mate Bagby did not inform Captain Alcott of the Plaintiff's condition on July 3rd

      or July 4th.  Bagby Depo. at 83; Alcott Depo. at 106.  The only information that Captain

      Alcott received regarding the Plaintiff's condition prior to July 5th was from the Plaintiff

      himself.  Alcott Depo. at 106.  Chief Mate Bagby should have informed Captain Alcott

      that Plaintiff felt fatigued and was drinking excess water and urinating frequently on July

      3, 2003.  Alcott Depo. at 107.

30.   Had Chief Mate Bagby told Captain Alcott prior to July 5th that the Plaintiff felt fatigued

      and tired, that he felt thirsty despite drinking large amounts of water, and that he was

      urinating frequently, Captain Alcott would have sought out the Plaintiff to evaluate his

medical condition for himself and to determine if any further medical treatment was needed.  Alcott Depo. at 108-09.

31.   On July 5, 2003, Plaintiff felt "real bad."  Stiward Test. (4/8/08).  He was more thirsty than before and was urinating more often.  Again, he told Chief Mate Bagby that he did not feel well, and Bagby replied, "I can see it."  Stiward Test. (4/8/08).  Bagby knew on July 5, 2008 that the Plaintiff had been experiencing constant thirst, urination, and fatigue for at least three days.  Plaintiff asked both Captain Alcott and Chief Mate Bagby for water while working on the bridge.  Stiward Test. (4/8/08).  Plaintiff began vomiting soon after beginning dinner on July 5th at or around 1700 hours (5:00 p.m.) local time.  Pl. Ex. 18; Def. Ex. 1-E.  Chief Mate Bagby saw the Plaintiff vomit.  Bagby Depo. at 65.  Plaintiff reported the event to Third Mate Bailey.  Third Mate Bailey diagnosed his condition as "cold/flu."  Pl. Ex. 18; Def. Ex. 1-E; Bailey Test. (4/9/08).  However, the Plaintiff did not exhibit signs of a running nose or congestion.  Bailey Test. (4/9/08).  Chief Mate Bagby instructed the Plaintiff to return to his room for rest and had another seaman stand the Plaintiff's watch.  Stiward Test. (4/8/08); Bagby Depo. at 65.  Third Mate Bailey brought the Plaintiff water and Pepto-Bismol on the evening of July 5th, both of which the Plaintiff vomited as well.  Stiward Test. (4/8/08).  On July 5, 2003, at noon local time, the M/V Cape Horn was 860 nautical miles north of Honolulu, Hawaii, and 1885 nautical miles west of Port Hueneme, California.  Hall Test. (4/10/08); Def. Ex. 25B, 37.

32.   On July 6, 2003, Plaintiff's condition continued.  He was "knocked off duty"; i.e., he was taken off the watch schedule by the officers and told to rest.  Plaintiff could not eat.  He

attempted to rest but had to frequently get up to urinate.  Chief Mate Bagby and Third

Mate Bailey visited the Plaintiff in his room during the afternoon on July 6th.  Plaintiff

informed them of his condition, and further told them that he felt "very weak, very, very

weak."  Stiward Test. (4/8/08).  On July 6th at noon local time, the M/V Cape Horn was

1400 nautical miles west of Port Hueneme, California, and approximately 960 nautical

miles north-northeast of Honolulu, Hawaii.  Hall Test. (4/10/08); Def. Ex. 25B, 37.  At

10:00 p.m. local time on July 6, 2003, the M/V Cape Horn was equidistant from

Honolulu, Hawaii and Port Hueneme, California.  Hall Test. (4/10/08).

33.    On July 7, 2003, the Plaintiff remained in bed rest.  During the afternoon of July 7th,

Third Mate Bailey visited the Plaintiff to check his vital signs.  The Plaintiff told Bailey

to get the captain because he thought he was going to die.  Captain Alcott then came to

visit Plaintiff; this was the first time that Captain Alcott saw the Plaintiff since he

vomited on July 5th.  Approximately an hour and forty minutes after Plaintiff asked for

the captain on July 7th, MAS doctors were contacted for the first time.  Bailey Test.

(4/9/08).  Captain Alcott made the decision to call MAS doctors.  Bailey Test. (4/9/08).

The initial contact form with MAS doctors shows that contact was made by voice on July

7, 2003 at 9:41 p.m., GMT.  Pl. Ex. 10.  On July 7th at noon local time, the M/V Cape

Horn was 840 nautical miles west of San Francisco, 1053 nautical miles west-northwest

of Port Hueneme, and 1180 nautical miles northeast of Honolulu.  Hall Test. (4/10/08);

Def. Ex. 25B, 37.

34.    The initial contact form with MAS doctors shows that "three and a half days" earlier, *i.e.*,

July 3, 2003, the officers thought that Plaintiff developed a "vague illness."  The M/V

Cape Horn crew stated that Plaintiff was "very, very, very dry" but that he was "still urinating."  Also, Plaintiff was "very weak on walking 8 feet to the bathroom."  Pl. Ex. 10.  On the basis of this information, the MAS doctor replied that Plaintiff "could have a diabetic hyperglycemic state," and requested a "[u]rine dipstick for glucose and ketones." Pl. Ex. 10.  MAS doctors also advised, "If the urine for glucose is negative then give a Compazine 25 mg suppository immediately before calling MAS," and to "report back to MAS as soon as possible."  Pl. Ex. 10.  The M/V Cape Horn had not yet received its requisition for a glucometer, so the officers needed to borrow one from one of the crewmembers in order to test the Plaintiff's glucose levels.  Bailey Test. (4/9/08).

35.     Approximately one and a half hours after the original contact with MAS doctors, the M/V Cape Horn crew contacted MAS doctors again (July 7, 2003 at 11:08 p.m. GMT). MAS doctors determined that "Diabetes Mellitis is the most likely etiology."  Also, they advised that "[u]rine analysis is pending and if it is abnormal we will need to get insulin to the patient or the patient to insulin.  In the absence of glucose measurements and electrolyte measurement, evacuation may be necessary if the glucose is elevated."  Pl. Ex. 10.

36.     Captain Alcott discovered that there was no insulin on board the M/V Cape Horn when MAS doctors told him that the Plaintiff needed treatment for diabetes, including an infusion of insulin, at some time on July 7, 2003.  Alcott Depo. at 180.  Captain Alcott expected insulin to be on board the M/V Cape Horn.  Alcott Depo. at 184, 191.  Captain Alcott sent Third Mate Bailey or the Second Mate Stan Gordon to find insulin supplies on July 7, 2003.  Alcott Depo. at 183.  Bailey or Gordon informed Captain Alcott that

none was available on the ship.  Captain Alcott then sought insulin supplies from other crewmembers, and he sent out a call to ships in the area for insulin, but neither source provided insulin.  Alcott Depo. at 180-83.  Had insulin been provided to the M/V Cape Horn by MTL in response to its order for medical supplies, insulin would have been on board the M/V Cape Horn when the Plaintiff fell ill due to diabetic ketoacidosis.  Bailey Test. (4/9/08).

37.     Approximately three and a half hours later (July 8, 2003, 2:47 a.m. GMT), MAS doctors were contacted again.  They noted that the Plaintiff's glucose and ketones were both "high" or at the "top of the scale."  Pl. Ex. 10.  The Plaintiff was "very lethargic and weak" with a "very dry" mouth.  The MAS doctors then assessed that the Plaintiff had diabetic ketoacidosis.  MAS doctors had been informed that no insulin was on board, that "none of the crewmembers use insulin" because "[t]hose [crewmembers] who have diabetes only have oral hypoglycemics."  One of the crewmembers did have a glucometer, however.  At this time, the ship was "36 hours away from helicopter evacuation range," and the captain was still attempting to contact nearby vessels.  Pl. Ex. 10.

38.     Two and a half hours later (July 8, 2003 at 5:12 a.m. GMT), MAS doctors were contacted again.  Captain Alcott had reported to the doctors that he had administered saline to the Plaintiff, but no nearly vessels with insulin were located.  Plaintiff's blood sugar level was "out of range," and he sometimes would not respond to verbal stimuli.  Captain Alcott requested advice on "what to do if the patient dies on board the vessel."  MAS doctors recommended to continue the saline administration, and instructed the captain on

how to confirm a patient's death.  Pl. Ex. 10.

39.   At some point between 3:40 p.m. on July 8th and 1:00 a.m. on July 9th (GMT), Coast
      Guard paramedics parachuted to the M/V Cape Horn and stabilized the Plaintiff.  They
      evacuated him by helicopter to San Francisco, California approximately five hours later.
      Malloy Test. (4/10/08); Pl. Ex. 10.

40.   The Plaintiff was flown from the M/V Cape Horn to California on July 8, 2003 and
      promptly admitted to the Stanford Medical Center in Palo Alto, California.  He was
      diagnosed by the emergency department with "hyperglycemia with acidosis, possible
      diabetic ketoacidosis," "probable gastrointestinal bleed," and "profound metabolic
      acidosis."  Pl. Ex. 27.  He was subsequently admitted to the intensive care unit (ICU) at
      Stanford Medical Center.  Pl. Ex. 27.

41.   On July 10, 2003 at 2:10 p.m. (GMT), the ICU nurse reported that the Plaintiff was
      "intubated, ventilated, in multi-organ failure, has pneumonia and is septic."  Pl. Ex. 10.
      The assessment was that "[t]he patient is critically ill and is not expected to live."  Pl. Ex.
      10.  The Plaintiff continued to be "critically ill" through July 11, 2003, at which time he
      had "pulmonary edema and multi-organ failure and [was] on a type of bedside dialysis."
      Pl. Ex. 10.

42.   On or about July 15, 2003, Plaintiff's condition improved.  He remained intubated, but
      there was "no evidence of cardiac or pulmonary dysfunction."  Pl. Ex. 10.  On July 16,
      2003, Stanford Medical Center doctors began to "wean [Plaintiff] off the ventilator," but
      he remained on "IV antibiotics, insulin and Lasix."  Pl. Ex. 10.  However, on July 23,
      2003, Plaintiff was still intubated, but conscious.  He was having "copious pulmonary

17

secretions and thus extubation [was] delayed." Doctors were concerned that the Plaintiff

contracted pneumonia. Pl. Ex. 10. On or about July 29, 2003, Plaintiff improved to the

point that he could be moved to the hospital ward. Pl. Ex. 10.

43.   The remaining medical inventory that had not been received by the M/V Cape Horn in

Fujairah was received when the ship returned to Port Hueneme in July 2003. Bailey

Test. (4/9/08); Pl. Ex. 57 (email reporting availability of medical supplies at Port

Hueneme on July 8, 2003).

44.   As a direct result of his diabetic ketoacidosis, Plaintiff contracted dry gangrene in both

feet. Mottram Test. (4/8/08); Pl. Ex. 27. While at Stanford Medical Center, Plaintiff was

also treated for diabetes, hypertension, acute renal failure, diabetic ketoacidosis, anemia,

deep venous thromboses, urinary tract infection, pancreatitis, and lower gastrointenstinal

bleed, among other diagnoses. Pl. Ex. 27.

45.   Plaintiff was discharged from Stanford Medical Center on August 13, 2003, and admitted

to the University Convalescent Hospital on the same day for rehabilitation. Pl. Ex. 34.

He remained in bed rest for his entire stay of approximately two and a half months at

University Convalescent Hospital. Stiward Test. (4/8/08). On October 22, 2003,

Plaintiff was discharged from University Convalescent Hospital and readmitted to

Stanford Hospital for amputation surgery due to the gangrene in his feet contracted as a

consequence of his diabetic ketoacidosis. Pl. Ex. 34; Stiward Test. (4/8/08).

46.   Plaintiff had to undergo bilateral transmetatarsal amputation of his feet, *i.e.*, the removal

of his forefeet, at Stanford Medical Center on October 22, 2003. Pl. Ex. 27. He received

a spinal anesthetic, but he was awake for the surgery. After the surgery, doctors

informed Plaintiff that they did not need to remove anything further.  Stiward Test. (4/8/08).

47.    Subsequent to amputation surgery, Plaintiff was admitted to Manor Care Rehabilitation Home on October 29, 2003.  Pl. Ex. 33.  He had to learn how to walk, how to use the bathroom, how to use a wheelchair where necessary, and otherwise how to care for himself in his new condition.  Stiward Test. (4/8/08).  He was provided with prosthetic devices to insert into his shoes that he must use in order to walk.  He was discharged from Manor Care in late December 2003.  Stiward Test. (4/8/08).

48.    Plaintiff experiences daily discomfort and pain.  He experiences "phantom" sensations in which he senses pain in his toes despite the fact that they have been amputated.  He has difficulty with bathing and walking.  He was not been able to return to work as a seaman.  Stiward Test. (4/8/08).

49.    The Defendant's medical expert, Dr. Vivian Fonseca, states in his book *Clinical Diabetes: Translating Research into Practice*, that common symptoms of diabetic ketoacidosis include: abdominal pain, nausea, polydipsia (frequent thirst/drinking of fluids), polyuria (frequent urination), vomiting, weakness, weight loss.  Pl. Ex 46.

50.    The M/V Cape Horn had a copy of *The Ship's Medicine Chest & Medical Aid at Sea*, a United States government publication, aboard during the relevant voyage.  Alcott Depo. at 48.  *The Ship's Medicine Chest & Medical Aid at Sea* provides information concerning how to examine a patient diagnose various ailments in terms clear to a person without medical training, such as a seaman.  Pl. Ex. 6; Grace Test. (4/9/08).  *The Ship's Medicine Chest & Medical Aid at Sea* includes a chapter entitled "Treatment of Diseases," with a

subsection concerning "Gastrointenstinal Diseases." Pl. Ex. 6. This subsection describes

the symptoms of diabetic ketoacidosis or hyperclycemia, explaining that symptoms

include dry mouth, thirst, acidic breath, dry skin, sunken eyes due to dryness, abdominal

pain, slight fever, nausea, and vomiting. Pl. Ex. 6. This section warns, "If not treated,

diabetic acidosis may cause unconsciousness (diabetic coma) and eventually death." Pl.

Ex. 6.

51.     Third Mate Bailey did not consult *The Ship's Medicine Chest & Medical Aid at Sea* or

any other medical reference materials until after MAS doctors had been contacted on July

7, 2003. Bailey Test. (4/9/08). Bailey consulted the materials only to learn how to insert

an intravenous (IV) line. Bailey Test. (4/9/08).

52.     The medical records from the M/V Cape Horn show that the Defendant was repeatedly

reporting a blister on his penis from June 30, 2003 through July 5, 2003. Pl. Ex. 3.

However, there was no effort at any time by Third Mate Bailey to inspect the affected

area personally. Third Mate Bailey did not make any attempt to otherwise determine

other symptoms or to review available medical materials to make a diagnosis of the

blister. Mottram Test. (4/8/08). The white blister on the Plaintiff's penis is consistent

with yeast balanitis. A competent physician who was presented with a description of a

white blister on the penis would have known that it can be an indicator of a patient's lack

of glucose control. Mottram Test. (4/8/08).

53.     The Court finds that the medical logbook from the M/V Cape Horn does not contain all

of the complaints that Plaintiff made to Captain Alcott, Chief Mate Bagby, and Third

Mate Bailey between June 30th and July 5th, 2003. Pl. Ex. 3. Third Mate Bailey's

testimony was not credible concerning when he received information from the Plaintiff concerning his condition. Bailey testified that the Plaintiff did not tell him that he was experiencing constant thirst and frequent urination, instead only informing him of the blister on his penis. The Court discredits this testimony; it is much more plausible that the Plaintiff would have told Bailey about his thirst and urination before revealing the more intimate fact that he had a blister on his penis.[6] Therefore, the Plaintiff most likely did inform Bailey that he was experiencing constant thirst and frequent urination prior to July 5th. The Court notes that Third Mate Bailey's testimony was sometimes evasive and vague; therefore the Court finds that a significant portion of his testimony, including that portion concerning what Plaintiff reported to him, was not credible.

54.  Captain Alcott, Chief Mate Bagley, and Third Mate Bailey all knew of Plaintiff's symptoms of nausea, frequent urination, and excessive thirds prior to July 5, 2003. However, none of them took appropriate action individually prior to July 7th. At no time prior to July 7th did they make a coordinated effort to diagnose and seek treatment for the Plaintiff.

## II. CONCLUSIONS OF LAW

55.  Under the Jones Act, "a seaman's employer is liable for damages if the employer's negligence caused the seaman's injury." *Johnson v. Cenac Towing Inc.*, 468 F. Sup. 2d

---

[6]The Court notes that Plaintiff appeared uncomfortable and hesitant when speaking about the blister he experienced on his penis. Plaintiff's demeanor during his testimony bolsters this Court's conclusion that he would much sooner tell Third Mate Bailey about his thirst and urination before revealing the fact that he had a blister on his penis.

815, 825 (E.D. La. 2006) (Vance, J.), *citing Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d

331, 335 (5th Cir. 1997).  Under the Fifth Circuit's *Gautreaux* opinion, the Jones Act

employer owes an ordinary duty of care to his employees, *i.e.*, the care that a "reasonable

person" of "ordinary prudence" would exercise.  *Gautreaux*, 107 F.3d at 334-35.[7]

56.　　Likewise, "[a] seaman ... is obligated under the Jones Act to act with ordinary prudence

under the circumstances.  The circumstances of a seaman's employment include not only

his reliance on his employer to provide a safe work environment but also his own

experience, training, or education.  The reasonable person standard, therefore, and a

Jones Act negligence action becomes one of the reasonable seaman in like circumstances.

To hold otherwise would unjustly reward unreasonable conduct and would fault seamen

only for their gross negligence, which was not the contemplation of Congress."

*Crawford v. Falcon Drilling Co., Inc.*, 131 F.3d 1120, 1125 (5th Cir. 1997); *quoting*

*Gautreaux*, 107 F.3d at 339.

57.　　As to causation under the Jones Act, however, the standard is a "slight" one, allowing an

injured employee to recover if the employer's negligence "played any part, even the

slightest, in producing the injury or death for which damages are sought."  *Gautreaux*,

107 F.3d at 335, *quoting Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506, 77 S.Ct.

443, 1 L.Ed.2d 493 (1957)).  "[E]ven in Jones Act cases the necessary causal connection

requires more than simple 'but for' cause," instead "[t]he negligence must be 'a legal

---

[7]The Fifth Circuit pointed out in *Gautreaux* that "nothing in the text or structure of the
FELA-Jones Act legislation suggests that the standard of care to be attributed to either an
employer or an employee is anything different than ordinary prudence under the circumstances."
*Gautreaux*, 107 F.3d at 338.

cause' of the injury." *Gavagan v. United States*, 955 F.2d 1016, 1019-20 (5th Cir. 1992).

However, "comparative negligence bars an injured party from recovering for damages

sustained as a result of his own fault." *Boudreaux v. United States*, 280 F.3d 461, 466

(5th Cir. 2002); *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1356 (5th Cir. 1988)

("Under the Jones Act and the law of seaworthiness, contributory negligence, however

gross, does not bar recovery, but only mitigates damages.") (citations omitted).

58.     While the Suits in Admiralty Act "serves as a waiver of sovereign immunity and

authorizes suits against the government in admiralty cases where such claims could be

brought against a private party[,] . . . the SAA does not waive immunity for discretionary

acts of government agencies that fall within the discretionary function exception set forth

in the Federal Tort Claims Act [FTCA]." *Theriot v. United States*, 245 F.3d 388, 397

(5th Cir. 1998), *citing Baldassaro v. United States*, 64 F.3d 206, 208 (5th Cir. 1995)

(holding discretionary function exception of the FTCA applies to the SAA).  Under the

discretionary function exception, the Government cannot be held liable for "[a]ny claim

based upon . . . the exercise or performance or the failure to exercise or perform a

discretionary function or duty on the part of a federal agency or an employee of the

Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see*

*Theriot*, 245 F.3d at 397 (quoting 28 U.S.C. § 2680).


## A.  Negligence

59.     "The legal obligation of a shipowner to attend to the medical needs of its crew is

undisputed: As shipowner has a duty to provide prompt and adequate medical care to its

seamen." *De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 140 (5th Cir. 1986)

(citations omitted).  As stated by the Supreme Court in the seminal case of *De Zon v.*

*American President Lines*, 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065 (1943):

> The duty to provide proper medical treatment and attendance for seamen falling ill or suffering injury in the service of the ship has been imposed upon the shipowners by all maritime nations.  When the seaman becomes committed to the service of the ship the maritime law annexes a duty that no private agreement is competent to abrogate, and the ship is committed to the maintenance and cure of the seaman for illness or injury during the period of the voyage, and in some cases for a period thereafter.  This duty does not depend upon fault. It is no merely formal obligation and it admits of no merely perfunctory discharge.  Its measure depends upon the circumstances of each case – the seriousness of the injury or illness and the availability of aid.  Although there may be no duty to the seaman to carry a physician, the circumstances may be such as to require reasonable measures to get him to one, as by turning back, putting in to the nearest port although not one of call, hailing a passing ship, or taking other measures of considerable cost in time and money.  Failure to furnish such care, even at the cost of a week's delay, has been held by this Court to be a basis for damages.

*De Zon*, 318 U.S. at 667-68, 63 S.Ct. at 818-19 (internal citations and quotations

omitted).

60.     A shipowner's and its officers' failure to provide adequate treatment for a crewman with

diabetes can form the basis of liability under the Jones Act.  In *De Centeno v. Gulf Fleet*

*Crews, Inc.*, 798 F.2d 138 (5th Cir. 1986), the plaintiff, a cook aboard a merchant vessel,

began feeling ill.  The vessel's agent arranged for him to see a local physician at Port

Hueneme, California.  The physician treated him for influenza.  Subsequent to the

plaintiff's return to the vessel, his shipmate noticed that his "condition deteriorated."  *Id.*

at 139.  He went "straight to bed" and he could be heard "moaning in pain" in his

abdomen.  *Id.*  Upon the plaintiff's return home, his personal doctor diagnosed diabetes

mellitus and diabetic pre-coma, and the plaintiff thereafter died due to bacterial infection and "[o]rganic exhaustion" due to his diabetic attack.  *Id.*  The Fifth Circuit, upon reviewing the verdict in favor of the plaintiff, found the local physician had been negligent in diagnosing plaintiff's condition, and held that the shipowner was "vicariously responsible for the negligence of a physician it chooses to treat its seaman." *Id.* at 140 (citations omitted).  Moreover, "[t]he jury was also entitled to find that the ship's officers were negligent in failing to seek additional medical treatment for [the plaintiff] following his return to the ship from his visit to [the local physician arranged by the vessel's agent]."  *Id.*  The court noted that plaintiff's expert physician who testified that "if [plaintiff] had received proper treatment in the United States for diabetes he could have resisted the organic infection that caused his death provided the necessary causal link between the negligent failure to treat [plaintiff] and his death."  *Id.*

61.  Similarly, in *Carmody v. Pronav Ship Management, Inc.*, 224 F.R.D. 111 (S.D.N.Y. 2004), a district court considered the negligence claim of a seaman who fell seriously ill during a voyage.  The seaman told the captain that there was "something seriously wrong" with him.  *Id.* at 123.  The following day, the seaman informed the first mate, who also was the ship's medical officer, that he was experiencing "excessive thirst, dry mouth, frequent urination, a lack of energy, and leg cramping, and that he had also learned that his pre-voyage medical report indicated elevated glucose."  *Id.*  Over the next several days, the plaintiff began staying in bed, getting "foggy" in the head, losing consciousness occasionally, and slurring his speech.  *Id.* at 123-24.  Several witnesses testified generally to his lethargy and deteriorating mental condition.  *Id.* at 124.  The

district court applied the general standard to medical care, and it found that the shipowner "failed to exercise the same degree of care that a reasonably prudent person would have exercised under the circumstances." *Id.* at 123. The court held that the plaintiff's crewmates failed to follow the shipowner's policy that stated if there were an illness "beyond the immediate capability of the crew, medical advisory assistance shall be requested," and the court noted that the ship had a contract with a 24-hour medical professional service. *Id.* at 124-25. The master and first mate stated that they could not determine how to treat the plaintiff, with the first mate testifying that he did not call the doctor because he would have felt "kind of silly" due to not having anything "concrete" to tell him regarding symptoms except for the fact that Plaintiff was "sick and he was getting sicker." *Id.* at 125. Plaintiff's expert testified that, where diagnosis or treatment is difficult, the proper procedure would have been to "pick up the phone and call for expert medical advice and counsel." *Id.* The court concluded that this failure constituted negligence. Having found negligence, the court also found causation. It noted that not only had the ship's officers failed to seek outside medical assistance, but they failed to consider administering intravenous fluid which would have helped considering that plaintiff "obvious[ly] . . . was badly dehydrated." *Id.* at 127. The court relied on the plaintiff's expert who opined that "earlier administering of fluid to [plaintiff] would have kept him from progressing to coma and critical illness." *Id.* at 128. This testimonial evidence and expert opinion were enough for plaintiff to prevail on a theory that this was the "exacerbating cause of his critical illness, even if not the root cause." *Id.* at 127.

62.   The Court finds that the late evening of July 5, 2003 was the last time that insulin and

fluids could have been administered in order to avoid the Plaintiff's contracting gangrene as a complication of his diabetic ketoacidosis and requiring amputation of his forefeet. If they had been administered on July 6th, the Plaintiff would have likely required amputation of his feet regardless of whether or not insulin was administered. Mottram Test. (4/8/08). Therefore, the diagnosis and commencement of treatment of the Plaintiff's condition would have had to begun on or before July 5, 2003.

63.     The Plaintiff presented testimony from an expert in maritime practice, Captain Joseph Grace. He testified that it is the duty of the Captain, Chief Mate, and Third Mate to coordinate their response to any medical issue being experienced by the crew. Grace Test. (4/9/08); *see* Goldberg Depo. at 95. In the present case, Captain Grace testified that, considering the information provided to them by the Plaintiff, Captain Alcott, Chief Mate Bagby, and Third Mate Bailey should have made a coordinated medical response to Plaintiff's condition on the second July 2nd or July 3rd. Grace Test. (4/9/08). The Court finds Captain Grace's testimony persuasive and credible.

64.     The Court finds that Captain Alcott, Chief Mate Bagby, and Third Mate Bailey breached their duty to provide Plaintiff with reasonable medical assistance on or before July 5, 2003. After the Plaintiff experienced constant thirst, stomach ache, fatigue, and frequent urination over the course of two days, the officers of the M/V Cape Horn should have called MAS doctors to seek a diagnosis. Hall Test. (4/10/08). Captain Alcott, Chief Mate Bagby, and Third Mate Bailey failed to coordinate their medical response to the Plaintiff's symptoms and condition from June 30th through July 6th, 2003. Indeed, they should have coordinated their response to Plaintiff's condition on the second July 2nd or

July 3rd.  Grace Test (4/9/08).  Had Captain Alcott, Chief Mate Bagby, and Third Mate Bailey coordinated their medical response to the Plaintiff promptly upon his reporting of symptoms, they would have reached the conclusion that Plaintiff's "vague" condition required contacting MAS doctors prior to the late evening of July 5, 2003.  Had MAS doctors been contacted with all of the Plaintiff's symptoms prior to the late evening of July 5, 2003, the Court finds that the MAS doctors, a 24-hour service, would have promptly reached substantially the same diagnosis of diabetic ketoacidosis, and they would have prescribed the same treatment of intravenous fluids and administration of insulin.  This failure by Captain Alcott, Chief Mate Bagby, and Third Mate Bailey to coordinate the medical response caused Plaintiff's condition to prolong, reaching a point that irreparable damage was caused, including the development of gangrene and eventual bilateral transmetatarsal amputation of both of Plaintiff's feet.

65.   Captain Alcott, Chief Mate Bagby, and Third Mate Bailey had the duty to ensure that the M/V Cape Horn's medical inventory was properly filled for its voyage to the Middle East.  The Court finds that Captain Alcott, Chief Mate Bagby, and Third Mate Bailey breached this duty.  Third Mate Bailey completed an inventory of M/V Cape Horn on February 1, 2003 and promptly thereafter filled the medical order form and included a request for insulin.  However, the officers of the M/V Cape Horn did not send the request for medical supplies until after the vessel departed from California in February 2003.  Moreover, the request for insulin was not included in the order sent to MTL on March 28, 2003.  Pl. Ex. 48.  Instead, insulin was first included in the order sent to MTL on April 23, 2003.  Pl. Ex. 48, 52.  This failure to request medical supplies in order to receive

28

them prior to departure was a breach of the officers' duty to provide medical care to the crew.  As a result, MTL did not have any opportunity to provide the M/V Cape Horn with the entire medical requisition order prior to departure from California.

66.    MTL had a duty to provide any requested medical items to its vessels.  Goldberg Depo. at 87.  MTL did not provide the M/V Cape Horn with its full request of medical supplies prior to the M/V Cape Horn's return to California in July 2003.  MTL had the capability of providing medical supplies to a vessel at port the next day if necessary.  Goldberg Depo. at 61.  MTL could have provided the requested medical supplies in Corpus Christ, Texas, or at the American military base at Rota, Spain.  MTL could also have provided the requested medical supplies to the M/V Cape Horn while the vessel was in the Middle East.  Because MTL provided the first half of the M/V Cape Horn's requested medical supplies in Fujairah, UAE, MTL could have provided the entire order of medical supplies.  MTL received the M/V Cape Horn's entire order because MTL filled the rest of the order upon the M/V Cape Horn's return to California.  No justification was provided by the Defendant regarding why MTL failed to provide the requested medical supplies.

67.    The failure of MTL and the M/V Cape Horn's officers to ensure that insulin supplies were provided to the M/V Cape Horn caused the Plaintiff to suffer irreparable damage due to diabetic ketoacidosis.  Even if the officers of the M/V Cape Horn had properly sought medical assistance from MAS doctors prior to July 6, 2003, they would not have been able to assist the Plaintiff because of the lack of insulin supplies on the ship.  This lack of insulin supplies resulted in the Plaintiff developing diabetic ketoacidosis, which

caused complications including dry gangrene in both of the Plaintiff's feet, consequently

requiring the bilateral transmetatarsal amputation of both of Plaintiff's feet.

68.    Had Captain Alcott, Chief Mate Bagby, and Third Mate Bailey coordinated their medical

response to Plaintiff's conditions prior to July 5th, they would have had the option of

diverting to Honolulu, Hawaii.  At noon local time on July 3rd, the M/V Cape Horn was

located approximately 1100 nautical miles northwest of Honolulu, Hawaii.  Def. Ex. 25B.

On July 4th at noon local time, the M/V Cape Horn was located approximately 950

nautical miles north-northwest of Honolulu, Hawaii, and approximately 2350 nautical

miles west of Port Hueneme, California.  Def. Ex. 25B.  On July 5, 2003, at noon local

time, the M/V Cape Horn was 860 nautical miles north of Honolulu, Hawaii, and 1885

nautical miles west of Port Hueneme, California.  Hall Test. (4/10/08); Def. Ex. 25B.

Therefore, the M/V Cape Horn was traversing approximately 420-450 nautical miles in a

day.  *See* Hall Test. (4/10/08).  Had Alcott, Bagby, and Bailey coordinated their response,

contacted MAS on July 3rd, and realized that insulin was needed, the M/V Cape Horn

could have been diverted to Honolulu and been within the 350-mile range of a rescue

helicopter pickup within two days.


**B.  The Discretionary Function Exception Does Not Apply**

69.     The discretionary function exception of the FTCA, which also applies to the SAA,

provides that the Government cannot be held liable for "[a]ny claim based upon . . . the

exercise or performance or the failure to exercise or perform a discretionary function or

duty on the part of a federal agency or an employee of the Government, whether or not

the discretion involved be abused.'" 28 U.S.C. § 2680(a); *see Theriot*, 245 F.3d at 397

(quoting 28 U.S.C. § 2680).  The Supreme Court has set forth a two-part test to determine

if the discretionary function exception shields the Government from liability.  "First, the

conduct must be discretionary in nature, that is it must 'involv[e] an element of judgment

or choice.'" *Theriot*, 245 F.3d at 397, *quoting United States v. Gaubert*, 499 U.S. 315,

322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991).  "'[I]t is the nature of the conduct,

rather than the status of the actor' that governs whether the exception applies.  *Gaubert*,

499 U.S. at 322, 111 S.Ct. at 1273, *quoting United States v. Varig Airlines*, 467 U.S. 797,

813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984).  "The requirement of judgment or

choice is not satisfied if a 'federal statute regulation or policy specifically prescribes a

course of action for an employee to follow,' because 'the employee has no rightful option

but to adhere to the directive.'" *Gaubert*, 499 U.S. at 322, 11 S.Ct. at 1273, *quoting*

*Berkovitz v United States*, 486 U.S. 531, 536, 108 S.Ct. 1954,1958-59, 100 L.Ed.2d 531

(1988).  Second, the judgment must have been based on "considerations of social,

economic, or political public policy," *Theriot*, 245 F.3d at 397, because "the purpose of

the exception is to 'prevent judicial "second-guessing" of legislative and administrative

decisions grounded in social, economic, and political policy through the medium of an

action in tort.'" *Gaubert*, 499 U.S. at 323, 11 S.Ct. at 1273-74, *quoting Varig Airlines*,

467 U.S. at 813, 104 S.Ct. at 2764; *see Theriot v. United States*, 245 F.3d 388, 392 (5th

Cir. 1998) (holding United States not liable where fishing boat struck underwater sill

owned by the Government because decision to place warning on navigational maps

instead posting a warning sign was a policy judgment protected by discretionary function

31

exception).

70.   In the present case, it appears that there is no statute or regulation explicitly requiring insulin on board.  The only relevant prescription is 46 U.S.C. § 11102:

> A vessel of the United States on a voyage from a port in the United States to a foreign port (except to a Canadian port), and a vessel of the United States of at least 75 gross tons as measured under section 14502 of this title, or an alternate tonnage measured under section 14302 of this title as prescribed by the Secretary under section 14104 of this title on a voyage between a port of the United States on the Atlantic Ocean and Pacific Ocean, shall be provided with a medicine chest.

46 U.S.C. § 11102(a).  The "medical chest" in this statute, however, is not described any further.  No examples of its contents are given in the statute.

71.   Because no statute prescribes the action of government actors, their decisions may be protected by the discretionary function exception if they exercised their judgment based on "considerations of social, economic, or political public policy."  Here, however, the Defendant's claim fails.  No person made a decision grounded in policy that the M/V Cape Horn did not need insulin on board.  Quite the opposite, the only decision made was to obtain insulin and other diabetic-treatment supplies, as evidenced by MTL's order form and the decision by the M/V Cape Horn's officers to request insulin.  At no point in trial was any reason given why the M/V Cape Horn did not obtain insulin.  There was no justification given for why the M/V Cape Horn crew waited until after departure from California in February 2003 to request replacement medical supplies.  No reason was provided concerning why Chief Mate Bagby did not send the medical requisition order until nearly two months after Third Mate Bailey gave him the requisition order and the M/V Cape Horn had departed from California.  No reason was given explaining why

none of the requisition orders for insulin supplies were fulfilled.  The Defendant did not

give any justification whatsoever for why MTL did not deliver insulin supplies to the

M/V Cape Horn for pick up en route to the Middle East, particularly at Corpus Christi,

Texas and the American military base at Rota, Spain.  There was no justification given

for why MTL did not deliver insulin supplies to the M/V Cape Horn during its tour in the

Middle East, particularly in Fujairah, UAE, where the M/V Cape Horn picked up half of

the medical supplies that it had requested.  Because no policy decision was ever made not

to stock insulin aboard the M/V Cape Horn, the discretionary function exception does not

apply.


**C.  Unseaworthiness**

72.   "To establish a claim of unseaworthiness, 'the injured seaman must prove that the owner

has failed to provide a vessel, including her equipment and crew, which is reasonably fit

and safe for the purposes for which it is to be used.'"  *Boudreaux*, 280 F.3d at 468,

*quoting  Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001); *see Liner v. J. B.*

*Talley and Co., Inc.*, 618 F.2d 327, 330 (5th Cir. 1980) ("A vessel, together with her

appurtenances, must be reasonably fit for her intended use, and the shipowner's duty to

furnish a seaworthy vessel is a type of liability without fault, to be considered separately

from his Jones Act duty of reasonable care.").  "Liability under the doctrine of

unseaworthiness does not rest upon fault or negligence." *Johnson v. Offshore Express,*

*Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988), *citing Hussein v. Isthmian Lines, Inc.*, 405

F.2d 946, 947 (5th Cir. 1968).  "In addition the plaintiff must establish a causal

connection between his injury and the breach of duty that rendered the vessel unseaworthy." *Id.*  The standard of causation in an unseaworthiness claim is more demanding than in Jones Act claims because "[t]o establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Johnson*, 845 F.2d at 1354 (citing *Smith v. Trans-World Drilling Co.*, 772 F.2d 157, 162 (5th Cir. 1985) and *Landry v. Oceanic Contractors*, 731 F.2d 299, 302 (5th Cir. 1984)).  Thus, the standard for seaworthiness does not bear solely upon the this fitness of this ship to stay afloat, but also bears upon its fitness of the vessel for its intended purpose and its intended crew.  *See Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354-55 (5th Cir. 1988) (vessel found unseaworthy "because, first, it lacked proper equipment for a person only five feet tall to make up an upper bunk in four to six foot seas, and, second, the vessel lacked adequate manpower.").  Indeed, "[w]hat may be unseaworthiness in one instance may not be in a different circumstance." *Rogers v. United States*, 452 F.3d 1149, 1154 (5th Cir. 1972).  "[T]he doctrine [of seaworthiness] is a growing concept, constantly undergoing redefinition as the risks of those protected are enlarged by changing technology and ship board technique." *Dillon v. M.S. Oriental Inventor*, 426 F.2d 977, 979 (5th Cir. 1970).

73.   In *Stevens v. Seacoast Co.*, 414 F.2d 1032, 1038-39 (5th Cir. 1969), the plaintiff brought suit after he severed several fingers while working on an oyster dredger along the Gulf Coast.  His unseaworthiness claim was based on the fact that oyster dredger was not

34

equipped with a radio to call for help and only had mild sedatives to dull the seaman's pain while the ship sought help. The Fifth Circuit held in favor of the plaintiff, finding the lack of a radio to be a "glaring deficiency in the vessel's equipment and hence her unseaworthiness." *Id.* at 1039. In considering the lack of sedatives, the court found:

> Bearing upon this is another glaring deficiency in the ship's stores and hence her unseaworthiness. She had a first aid kit of sorts. What sorts we do not know. The record is clear, however, that it did not contain any sedation stronger than aspirin. And even these were not administered. . . . When time – which was passing by needlessly from the failure of the vessel to have rudimentary radio communication facilities – is filled with conscious pain that cannot be reduced or alleviated from want of sedations which a vessel ought, and is permitted to carry, the damage for this element becomes augmented and is traceable to unseaworthiness and negligence of Shipowner.

*Id.* at 1040.

74.    The lack of medical supplies aboard the M/V Cape Horn in this case made it unseaworthy. The M/V Cape Horn was a general cargo vessel owned by the United States government. It was placed in the service of MARAD in support of the United States military. The vessel was operated by MTL, and it performed transoceanic voyages to foreign countries as part of its service. In some cases, these journeys could involve delivery to less-developed countries. As stated above, crewmember would not be rejected from service simply because he is diabetic. *See* Goldberg Depo. at 48. Moreover, the M/V Cape Horn took on other military personnel abroad in this case, specifically members of the Puerto Rican national guard charged with guarding the M/V Cape Horn's cargo. Bagby Depo. at 153; Trial Tr. (4/10/08). In such service that involves long-term deployment, deep-sea ocean travel, and can involve transportation to potential war zones, it is necessary for a vessel to have a well-stocked medical kit in

35

order for it to be "reasonably fit and safe for the purposes for which it is to be used." *Boudreaux*, 280 F.3d at 468.  Considering Fifth Circuit precedent holding that a coastal oyster dredger should stock sedatives in order to be deemed seaworthy, see *Stevens*, *supra*, it is not a great leap to require a vessel that traverses thousands of miles of open ocean and performs potentially dangerous missions in foreign countries to stock insulin. Indeed, MTL's medical inventory form provided a policy of stocking various critical medical products, including insulin.  *See* Pl. Ex. 5; Grace Test. (4/9/08).  As stated above, the failure of the M/V Cape Horn to stock insulin, along with the failure of the M/V Cape Horn's officers to treat Plaintiff promptly, resulted in the Plaintiff continuing to suffer from diabetic ketoacidosis, enduring significant pain and long treatment, culminating in the amputation of his forefeet.

75.    The failure to provide an appropriate trained crew is also grounds for a finding of unseaworthiness.  "A vessel's condition of unseaworthiness might arise from any number of circumstances.  Her gear might be defective, her appurtenances in disrepair, her crew unfit."  *Usner v. Luckenback Overseas Corp.*, 400 U.S. 494, 496, 91 S.Ct. 514, 515, 27 L.Ed.2d 562 (1971) (footnotes omitted); *see Comeaux v. T. L. James & Co., Inc.*, 666 F.2d 294, 299 (5th Cir. 1982), *quoting June T., Inc. v. King*, 290 F.2d 404, 407 (5th Cir. 1961) ("Of course, to be inadequate or improperly manned is a classic case of an unseaworthy vessel.").  In *Marceaux v. Conoco, Inc.*, 124 F.3d 730 (5th Cir. 1997),[8] the

---

[8]The *Marceaux* opinion was superseded on other grounds by the 2000 amendment to Federal Rule of Evidence 103(a).  *See Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002) (recognizing superseding of *Marceaux* by rule amendment that does not require an objection at trial to preserve objection to expert testimony).

Fifth Circuit addressed a claim by a seaman in which he was injured when he attempted to lift a crossover hose aboard a pushboat after being directed to do so by his superior. The plaintiff claimed that the owner should be liable because he did not have the proper equipment and was not trained in this particular task. *Id.* at 732-33. The Fifth Circuit agreed, noting that, along with expert testimony asserting the plaintiff's lack of training, the plaintiff "confirmed his lack of knowledge regarding his ability to lift the crossover hose using procedures he had been taught by [Defendant shipowner] and testified as to how the attempted lift injured his back." *Id.* at 734; *see Bonefont v. Valdez Tankships*, 136 F.3d 137 (5th Cir. 1998) (unpublished opinion) (affirming judgment where boatswain's directions caused seaman's injury and finding that "boatswain was inadequately trained to handle the loading operation that he was assigned and that this ill-training rendered the [vessel] unseaworthy"); *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 635 (E.D. La. 2007) (Fallon, J.) (finding defendant's vessel unseaworthy where ship lacked proper equipment and "crew was ill-trained for the task of untangling the birdnested cable, and vessel's captain ordered the crew to use an improper procedure in order to accomplish the task" that resulted in plaintiff's injury).

76.     The M/V Cape Horn was similarly rendered unseaworthy due to MTL's failure to appropriately train Third Mate Bailey as the medical officer of the M/V Cape Horn. MTL had a policy that automatically designated the third mate as the medical officer aboard all of the vessels it operated. Goldberg Depo. at 111. The relevant voyage of the M/V Cape Horn in this case was Third Mate Bailey's first tour of duty as a licensed deck officer. He was 24 years of age at the time. Bailey Test. (4/9/08). Third Mate Bailey

received only summary education in marine medical treatment.  He received basic

medical training while studying at the United States Merchant Marine Academy.  He

took a basic first aid and CPR course.  He had not received any further medical training

prior to taking on the role of medical officer for the M/V Cape Horn.  Bailey Test.

(4/9/08).  He had to consult medical materials in order to insert an intravenous (IV) line.

Bailey Test. (4/9/08).  Due to Bailey's lack of experience, he did not seek to personally

examine Plaintiff when he first complained about a blister on his penis.  Bailey also had

no knowledge regarding when MAS doctors should be contacted, because MTL did not

have any policy, guidelines or materials for crews that instructs crews concerning when it

is appropriate to contact MAS doctors.  *See* Goldberg Depo. at 104.  His lack of

experience also resulted in his failure to contact Captain Alcott earlier and with a more

thorough explication of Plaintiff's symptoms.  Had MTL provided Bailey with

appropriate training concerning medical examination, in recognizing symptoms, and in

knowing when to contact MAS doctors, Plaintiff's injury would have been substantially,

if not completely, avoided.  Indeed, the M/V Cape Horn was not the *Pequod*, but

considering the treatment Plaintiff received prior to being evacuated from the vessel, it

might as well have been.  Therefore, this Court finds MTL's failure to train the M/V

Cape Horn's medical officer, Third Mate Bailey, caused the M/V Cape Horn to be

unseaworthy, and that this unseaworthy condition was a substantial part in directly

causing the Plaintiff's injury.


**D.  Comparative Negligence**

77.    As stated above, general maritime law principles hold that "comparative negligence bars

an injured party from recovering for damages sustained as a result of his own fault."

*Boudreaux*, 280 F.3d at 466.  "A seaman's contributory negligence will not bar his

recovery, but may reduce the amount of damages owed proportionate to his share of

fault."  *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006).  It is the duty of

the seaman to exercise the care of "the reasonable seaman in like circumstances."

*Crawford*, 131 F.3d at 1125; *see Boudreaux*, 280 F.3d at 466 ("The standard of care for a

seaman under the Jones Act is to act as an ordinarily prudent seaman would act in similar

circumstances.").  "[A] claim under the Jones Act . . . requires a finding both of negligent

breach of duty . . . and proximate cause."  *Gavagan*, 955 F.2d at 1020, n.6, *quoting Myles*

*v. Quinn Menhaden Fisheries, Inc.*, 302 F.2d 146, 150 (5th Cir. 1962).

78.    In *Patterson v. Allseas USA, Inc.*, 137 Fed. Appx. 633 (5th Cir. 2005) (unpublished

opinion), the Fifth Circuit found that a seaman could not recover under the Jones Act

where his employer had allegedly failed to warn the seaman of the dangers associated

with descending a stairway with wet boots.  The court reasoned that the injured seaman,

who was "intimately familiar" with the vessel as the main safety official, should have

known of the dangers of descending stairs with wet boots and nothing the captain could

have done "would have armed [plaintiff] with any more knowledge than he had when he

walked out of the standing water toward the stairway."  *Id.* at 637-38.

79.    Applying the reasonable seaman in like circumstances standard, the Court finds that the

Plaintiff in this case did not breach any duty.  The Court found Plaintiff's testimony

eminently credible, and it is upon this testimony that this decision substantially rests.

Plaintiff was a 61-year-old man with an eighth grade education at the time of this incident.  Plaintiff admitted that he had been diagnosed and treated for diabetes prior to 2003, and that he had received some instruction from a social worker on diabetes. However, he had never been affirmatively told by a medical professional that he had diabetes and that it is a permanent condition.  He was never put on prescription medications or any dietary regimen.  Applying the reasonable person under like circumstances test, this Court concludes that a reasonable seaman with the same lack of information, education and training regarding diabetes as Plaintiff would not have believed that he  had diabetes and that he could possible require insulin on board the M/V Cape Horn.  Therefore, Plaintiff did not breach his duty to apprise his employer of his diabetic condition.

80.     Furthermore, this Court finds that the Plaintiff's omission here did not cause any part of his injury.  Presuming *arguendo* that Plaintiff did breach a duty to inform his superiors of his diabetic condition, nothing in the chain of events would have changed.  The vice president of operations for MTL Captain Victor Goldberg explained that a crewmember would not be rejected from service simply because he is diabetic.  *See* Goldberg Depo. at 48.  There was no evidence that any special indication would have been given to the officers of the M/V Cape Horn that a diabetic crewmember would be aboard.  Instead, crewmembers were understood to bring their own prescriptions aboard, and Plaintiff indeed did bring his prescription for prostate cancer.  He did not bring insulin or other diabetic medication because he was never prescribed any.  The failure of the M/V Cape Horn to stock insulin was not because no person on the ship had reported being diabetic;

it was because the M/V Cape Horn's officers failed to promptly get the requisition order to MTL, and MTL failed to promptly fulfill the requisition.[9]  Furthermore, even if the Plaintiff had told the screening physician that he had been diagnosed with diabetes, it would not have affected the response by the M/V Cape Horn's officers in late June and early July 2003.  Plaintiff would still have been allowed to serve aboard the M/V Cape Horn, and the response of Captain Alcott, Chief Mate Bagby, and Third Mate Bailey to Plaintiff's complaints would still have been uncoordinated.  These officers still would have lacked any clear communication concerning his symptoms.  There was no serious attempt by Third Mate Bailey to diagnose Plaintiff's condition, and there was no evidence that he tried to access Plaintiff's medical records.  The M/V Cape Horn's officers only decided to contact MAS when the Plaintiff believed he was dying.  While Plaintiff then told Third Mate Bailey about his family history of diabetes, it is clear that this information did not play any significant role in the MAS doctors' diagnosis.  Thus, any added medical history regarding diabetes from the Plaintiff would have had no impact whatsoever on the M/V Cape Horn's failure to obtain insulin, the failure of MTL to provide insulin, and the failure of the M/V Cape Horn's officers to promptly respond to Plaintiff's condition and contact MAS.

## III. DAMAGES

---

[9]Notably, Third Mate Bailey requested insulin to be ordered because, according to MTL's inventory sheet, the M/V Cape Horn needed to restock that item.  No medical item for the inventory was obtained because a crewmember specifically needed. it.  Thus, any failure by the Plaintiff to inform his employer of his condition would have had no impact on what was ordered for the medical inventory.

81.    A seaman who succeeds in a Jones Act claim is entitled to recover "all of his pecuniary losses . . . includ[ing] loss of earning capacity, medical expenses, and pain and suffering." *Johnson v. Cenac Towing Inc.*, 468 F. Supp. 2d 815, 834 (E.D. La. 2006) (Vance J.) (citing *Cruz v. Hendy Int'l Co.*, 638 F.2d 719, 723 (5th Cir.1981), *rev'd on other grounds by Michel v. Total Transportation, Inc.,* 957 F.2d 186, 191 (5th Cir.1992)). A seaman who is injured as a result of a vessel's unseaworthiness is entitled to recover damages "for his loss of earnings, past and prospective, for medical expenses reasonably incurred in the past and to be incurred in the future, and also an additional sum on account of his physical injuries and for pain and suffering." *Sosa v. M/V Lago Izabal*, 736 F.2d 1028, 1034 (5th Cir. 1984).

82.    The parties stipulated that, should the Court rule in favor of the Plaintiff on liability, the economic damages in this case shall be $140,000.00 if this Court finds that the Plaintiff does have residual earning capacity since reaching his maximum medical improvement. Should the Court find that the Plaintiff does not have any residual earning capacity, then the parties stipulated that the economic damages would be $210,000.00.  This stipulation regarding economic damages only concerned past and future wages, and it was exclusive of all other damages, *i.e.*, it did not apply to general damages for pain and suffering, interest, etc.  (Rec. Doc. 74).

83.    Concerning past and future wages, the Court received testimony that Plaintiff presently experiences significant daily discomfort, and even pain, and has very limited mobility. He also has a limited educational background.  His employment history substantially includes only physically demanding jobs and includes little sedentary labor experience.

Meunier Test. (4/8/08). The Court credits the testimony of Plaintiff's vocational expert, Dr. Thomas Meunier, and finds that Plaintiff no residual earning capacity. Therefore, the Court will award Plaintiff the stipulated amount based on this finding, $210,000.00. According to the parties' stipulation, this award concerns economic damages for past and future wages only.

84.   As to general damages, including pain and suffering, the Court finds that the Plaintiff has suffered a significant amount of pain and suffering due to the negligence of MTL and the M/V Cape Horn's crew and the unseaworthiness of the vessel. Plaintiff's diabetic ketoacidotic condition was prolonged through at least July 8, 2003, whereas it could have been almost completely averted by prompt, competent treatment aboard the M/V Cape Horn. As a result of the extended nature of his condition, Plaintiff suffered multi-organ failure at Stanford Medical Center, and was not expected to live. He recovered, but developed dry gangrene that required bilateral transmetatarsal amputation of both of his feet. He required six months of rehabilitative stay at a hospital. He experiences daily pain and discomfort, including phantom limb pain from the amputation. The Court awards $750,000.00 for pain and suffering.

85.   Under the Suits in Admiralty Act, "[a] judgment against the United States or a federally owned corporation under this chapter may include costs and interest at the rate of 4 percent per year until satisfied." 46 U.S.C. § 30911(a). However, "[i]nterest shall run as ordered by the court, except that interest is not allowable for the period before the action is filed." *Id.* The Court awards prejudgment interest on the award of $960,000.00 for economic damages and pain and suffering, at a rate of 4 percent per year, commencing

from the date of filing of this action, May 23, 2005.  (Rec. Doc. 1).  In addition, the Court awards costs to the Plaintiff.


**IV.      CONCLUSION**

For the reasons stated herein, accordingly

**IT IS ORDERED** that the Court finds in favor of the Plaintiff on the Plaintiff's claims of negligence and unseaworthiness; and,

**IT IS FURTHER ORDERED** that Defendant United States pay Plaintiff damages in the amounts of $210,000.00 in economic damages and $750,000 in general damages, with interest on both awards accruing at a rate of 4 per cent per year from the date of the filing of this action; and,

**IT IS FURTHER ORDERED** that the Plaintiff is awarded costs in this matter.

A judgment will be rendered accordingly.

New Orleans, Louisiana, on this  _7th_  day of May, 2008.


_____
         **STANWOOD R. DUVAL, JR.**
         **UNITED STATES DISTRICT JUDGE**